**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**WILLIAM G.,**

              **Plaintiff,**

   **v.**                             **Civil Action 2:22-cv-213**
                                       **Judge James L. Graham**
                                       **Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

              **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, William G., brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for Disability Insurance Benefits ("DIB"). For the following reasons, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's nondisability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## I.    BACKGROUND

On May 6, 2019, Plaintiff protectively filed an application for DIB alleging disability beginning September 20, 2014, due to osteoarthritis of the shoulder requiring surgery, which then lead to depression; hearing loss and tinnitus; and ocular hypertension. (Tr. 147–48, 184). After his application was denied both initially and upon reconsideration, the Administrative Law Judge (the "ALJ") held a telephone hearing on January 15, 2021. (Tr. 36–58). The ALJ denied Plaintiff's application in a written decision on February 2, 2021. (Tr. 10–35). When the Appeals Council denied review, that denial became the final decision of the Commissioner. (Tr. 1–6).

Next, Plaintiff brought this action. (Doc. 1). As required, the Commissioner filed the administrative record, and the matter has been fully briefed. (Docs. 5, 8, 10, 11).

## A.    Relevant Statements to the Agency and Hearing Testimony

The ALJ summarized Plaintiff's hearing testimony as well as his statements to the agency:

> [Plaintiff] lives in a home with his wife (Hearing Testimony). He alleges disability resulting from osteoarthritis of the shoulder, tinnitus, ocular hypertension, hearing loss, anxiety, and depression (Exs. 12E; 3E; Hearing Testimony). [Plaintiff] further alleges that these conditions limit his ability to stand, walk and otherwise move his body freely, lift objects, reach, use his hands, remember, complete tasks, concentrate, understand, and get along with others (Ex. 4E; Hearing Testimony).

(Tr. 19–20).

> [Plaintiff]'s activities include caring for his basic personal hygiene, caring for his plants, preparing simple meals, doing housecleaning, dusting, vacuuming, doing dishes, mowing the lawn, gardening, doing yardwork, weeding the yard, driving, shopping, going to restaurants with his wife, and socializing with his neighbors at times (Ex. 4E; Hearing Testimony).

(Tr. 23).

## B.    Relevant Medical Evidence

The ALJ also summarized Plaintiff's medical records and symptoms related to his impairments during the relevant period:

> In September 2014, [Plaintiff] suffered an injury to his left shoulder while working. His pain and stiffness worsened, and December 2014 MRI imaging showed partial thickness tearing along the rotator cuff and tendinopathy (Exs. 1F/20-30; 18F; 2F/3-5, 8-12; 14F/10-12).
>
> During a February 2015 return to work examination, [Plaintiff] reported weakness but little pain overall, and noted injections had been very helpful. He presented with slightly decreased grip strength and possible slightly decreased rotator cuff strength, but overall normal range of motion and no tenderness. [Plaintiff] was advised to continue with strengthening exercises and present for a surgical opinion (Ex. 1F/2-4).
>
> [Plaintiff] presented for further left shoulder injections in July 2015 (Ex. 2F/5).
>
> An MRI of [Plaintiff]'s left shoulder in July 2015 showed a likely small partial tear of the supraspinatus tendon and possible small insertional tear of the supraspinatus tendon (Ex. 2F/7).
>
> In November 2015, [Plaintiff] underwent left shoulder arthroscopic rotator cuff repair, extensive debridement, and subacromial decompression (Ex. 2F/13, 21-23).

2

In a February 2016 follow-up with orthopedist Charles Marty, M.D., [Plaintiff] endorsed some continued pain and weakness, but that he was doing well overall and improving with physical therapy. Dr. Marty noted minimal pain with reaching but an ability to reach overhead to 165 degrees, and no tenderness in the elbow. Dr. Marty recommended that [Plaintiff] continue with his exercises (Ex. 1F/18-19).

During orthopedic follow-up appointments between March and July 2016, [Plaintiff] noted some ongoing weakness, pain, and decreased functioning; but also noted that physical therapy was helpful overall. Gerald Inks, P.A.-C., noted 4/5 supraspinatus strength; but otherwise[,] full strength throughout, intact sensation, full range of motion, and normal mood and affect. Mr. Inks recommended continued physical therapy. In July 2016, Mr. Inks noted "[Plaintiff] presents today with great shoulder range of motion and excellent shoulder strength" (Ex. 2F/28-46).

[Plaintiff] presented to Mark Pellegrino, M.D., for a return-to-work examination in October 2016. He presented with reduced range of motion "due to [Plaintiff] guarding, resisting, and reports of increased pain; and the active and passive rangings were inconsistent." Dr. Pellegrino further noted no swelling or effusion, and intact strength and sensation (Ex. 6F/21-24).

In December 2016, [Plaintiff] presented to Douglas Pawlarczyk, Ph.D., for psychological evaluation. He reported depression, anhedonia, poor self-esteem, social isolation, and irritability. Dr. Pawlarczyk noted tense affect and somewhat impaired concentration; but cooperative behavior, appropriate hygiene, intact thought processes, normal speech, an alert and oriented presentation, intact judgment and insight, and intact memory and cognition. Dr. Pawlarczyk recommended psychotherapy (Ex. 10F).

[Plaintiff] presented to Jeffrey Christiansen, Psy.D., in February 2017 for psychological evaluation. He endorsed depression, decreased self-confidence, social withdrawal, and irritability. Dr. Christiansen noted sad affect; but cooperative behavior, appropriate hygiene, intact thought processes, normal speech, an alert and oriented presentation, intact judgment and insight, and intact memory and cognition (Ex. 3F).

[Plaintiff] presented to Advantage Health and Rehabilitation Centers between April 2016 and March 2017 for treatment and rehabilitation of his left upper extremity. He endorsed stiffness, pain, and weakness. During sessions, it was noted that [Plaintiff] presented with somewhat reduced strength and pain with range of motion, but he participated actively in the course of therapy and was also noted to make improvements in strength and range of motion. In December 2016, treatment notes indicated "overall doing much better [and] looking forward to getting back to work when possible" (Exs. 6F/76-321; 17F/1-104, 171-176).

3

In April 2017, [Plaintiff] presented to his primary care provider with complaint of worsening depression related primarily to his left shoulder pain. John Abad, M.D., noted intact strength and sensation throughout. Dr. Abad prescribed sertraline and encouraged continued therapy (Ex. 12F/13-14).

[Plaintiff] presented to orthopedist Michal Lefkowitz, M.D., for evaluation in December 2018. He reported continued stiffness and pain in the left shoulder, but acknowledged that physical therapy had been helpful. On examination, Dr. Lefkowitz noted tenderness over the glenohumeral joint; but no pain in the scapula or spine, no pain in the elbow or wrist, intact sensation, and overall full range of motion. Dr. Lefkowitz administered a glenohumeral injection (Ex. 14F/8).

During further treatment with Advantage Health and Rehabilitation Centers between April 2017 and January 2019, [Plaintiff] reported continued pain and decreased functioning in the left upper extremity, but also noted that treatments had been at least somewhat helpful. [Plaintiff] presented with mildly reduced strength, occasional reduced range of motion and stiffness, and tenderness; but overall improvements were noted in strength and movement. In March 2018, treatment notes indicated that [Plaintiff] had "residual left shoulder deficits" and further active rehabilitation was recommended, but improvement in strength and endurance was also acknowledged (Exs. 6F/36- 70, 322-484; 17F/105-171, 212-235).

[Plaintiff] presented to Dr. Lefkowitz between February and May 2019 for treatment. He reported pain and stiffness, but noted that injections were helpful overall. Dr. Lefkowitz noted tenderness but overall normal range of motion. [Plaintiff] was encouraged to present for additional injections (Ex. 14F/18-23).

In May 2019, [Plaintiff] presented to his primary care provider with complaint of worsening depression. Dr. Abad noted normal mood and affect and intact judgment and insight; as well as intact strength and sensation in the upper extremities. Dr. Abad increased [Plaintiff]'s bupropion and sertraline (Ex. 5F/4-5).

When [Plaintiff] presented to a Social Security field office for a teleclaim in June 2019, he had somewhat impaired concentration; but he had no issues with understanding or remembering, and was polite and pleasant (Ex. 1E).

In November 2019, [Plaintiff] presented to Deborah Koricke, Ph.D., for psychological evaluation. He reported depression and anxiety, anhedonia, poor self-esteem, social isolation, and irritability. Dr. Koricke noted somewhat sad mood; but cooperative and pleasant behavior, appropriate hygiene, intact thought processes, and intact concentration (Ex. 9F).

[Plaintiff] presented to Weinstein & Associates, Inc., for therapeutic treatment on an ongoing basis between January 2017 and December 2019. He endorsed depression, anxiety, anhedonia, decreased self-esteem, insomnia, social

4

withdrawal, irritability, and decreased persistence and concentration. Ryan Borchers, M.Ed., L.P.C.C., and Lee Roach, Ph.D., noted that [Plaintiff] presented as depressed and anxious during appointments; but also made some improvements in functioning and awareness of his behaviors, as well as engaging in treatment. [Plaintiff] was encouraged to present for regular treatment to increase healthy coping skills and improve his emotional regulation and distress tolerance (Exs. 4F; 16F/18-183, 206-220; 19F/1-148).

In January 2020, [Plaintiff] presented to Lisabeth Babson, Ph.D., for a psychological evaluation. He described anhedonia, decreased productivity, and hopelessness. Dr. Babson noted flat and tearful affect; but appropriate hygiene, cooperative behavior, orientation to place and time, intact cognition and memory, and intact concentration (Ex. 16F/10-17).

[Plaintiff] continued to present to Advantage Health and Rehabilitation Centers for rehabilitative treatment between February 2019 and March 2020. He reported continued pain and decreased functioning in the left upper extremity, but noted that injections and rehabilitative exercises were at least somewhat helpful and had resulted in less pain and increased strength. [Plaintiff] presented with mildly reduced strength, tenderness, and pain with range of motion; but he had improving range of motion, and overall intact sensation. In January 2019, treatment notes indicated "dull ache but better mobility, getting stronger too;" and in August 2019, it was noted that "overall the left shoulder is getting better and better" (Exs. 8F; 6F/485-533; 7F/177-211).

[Plaintiff] presented for left shoulder injections in March 2020. He presented with slightly diminished strength but overall intact range of motion and intact sensation. X-rays taken prior to the injection indicated possible slight elevation of the humerus with respect to the glenoid, but no significant cystic or degenerative changes (Ex. 14F/2-4).

In June 2020, [Plaintiff] presented to April Mancuso, Psy.D., for psychological evaluation. He endorsed depression, anxiety, anhedonia, social withdrawal, and irritability. Dr. Mancuso noted flat and tearful affect; but intact thought processes, normal speech, an alert and oriented presentation, intact judgment and insight, and intact cognition (Ex. 20F).

[Plaintiff] presented to musculoskeletal specialist Mini Goddard, M.D., in June 2020 for evaluation of his left shoulder. He reported continued pain and loss of functionality. On examination, Dr. Goddard noted left grip strength at 4/5, and decreased elbow supination with pain elicited; but otherwise[,] full range of motion in the left upper extremity, no swelling or effusion, and otherwise full strength (Ex. 18F).

[Plaintiff] presented to Mr. Borchers and Dr. Roach for therapeutic treatment between January and June 2020. He reported depression and anxiety, hopelessness,

sleep disturbance, social isolation, irritability and anger, and decreased concentration. Mr. Borchers and Dr. Roach noted that [Plaintiff] presented as depressed and anxious at times but also made note of improvements gained through continued treatment. [Plaintiff] was encouraged to present for regular treatment (Exs. 16F/184-205; 19F/149-166).

(Tr. 20–23).

### C.     The ALJ's Decision

The ALJ found that Plaintiff last met the insured status requirement through June 30, 2020, and did not engage in substantial gainful employment during the period from his alleged onset date of September 20, 2014, through his date last insured of June 30, 2020.  (Tr. 16).  The ALJ determined that, during that time, Plaintiff had the following severe impairments: left shoulder rotator cuff tear, left lateral epicondylitis, and major depressive disorder.  (*Id.*).  Still, the ALJ found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment.  (Tr. 17).

As to Plaintiff's residual functional capacity ("RFC"), through the date last insured, the ALJ concluded:

> [Plaintiff] had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that [Plaintiff] may never climb ladders, ropes, or scaffolds; may never crawl, and may do no work at unprotected heights. [Plaintiff] may do no overhead reaching with the dominant left upper extremity; may occasionally push and pull with the left upper extremity; and may frequently, as opposed to continuously, handle and finger with the left upper extremity. [Plaintiff] can have frequent interaction with supervisors, and occasional interaction with coworkers and the public. [Plaintiff] can concentrate, persist, and maintain pace to perform simple, routine tasks and make simple work-related decisions; and can adapt to and tolerate no more than occasional changes in a routine work setting.

(Tr. 19).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of his symptoms are not entirely consistent with the medical evidence and other evidence in the record."  (Tr. 23).

6

Relying on the vocational expert's testimony, the ALJ found that, through the date last insured, Plaintiff was unable to perform his past relevant work as a printing press operator/graphic designer. (Tr. 28). Yet, considering his age, education, work experience, and the above RFC, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy, such as an office clerk, custodian, or laborer. (Tr. 28–29). As a result, he concluded that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from September 20, 2014, the alleged onset date, through June 30, 2020, the date last insured (20 CFR 404.1520(g))." (Tr. 29).

## II.  STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Here, Plaintiff challenges how the ALJ considered supportability and consistency when evaluating three separate medicinal opinions.  (Doc. 8 at 11 (arguing that Dr. Babson's, Dr. Roach's, and Dr. Mathias' opinions were improperly considered)).   This failure to comply with the regulations, Plaintiff says, resulted in functional limitations being omitted from consideration and an unsupported RFC.  The Undersigned agrees that the ALJ improperly considered supportability, and remand is recommended.

### A.    RFC Standard

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009).  *See also* 20 C.F.R. §§ 404.1545(a), 416.945(a).   The Social Security regulations, rulings, and Sixth Circuit precedent provide that the ALJ is charged with the "final responsibility" in determining Plaintiff's residual functional capacity.  20 C.F.R. § 404.1527(d)(2). And it is the ALJ who resolves conflicts in the medical evidence.  *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984).   Still, in the final analysis, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

When determining the RFC, the ALJ is charged with evaluating several factors, including the medical evidence (not limited to medical opinion testimony) and Plaintiff's testimony. *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-cv-2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010) (citing *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)).   The RFC assessment must be based on all the relevant evidence in Plaintiff's case file.  20 C.F.R. § 416.945(a)(1).  "Ultimately, 'the ALJ must build an accurate and logical bridge between the evidence and his conclusion.'"  *Davis v. Comm'r of Soc. Sec.*, No. 2:19-CV-265, 2019 WL

5853389, at *5 (S.D. Ohio Nov. 8, 2019), *report and recommendation adopted*, No. 2:19-CV-265, 2020 WL 1482318 (S.D. Ohio Mar. 27, 2020) (quoting *Waye v. Comm'r of Soc. Sec.*, No. 1:18-CV-201, 2019 WL 364258, at *5 (S.D. Ohio Jan. 30, 2019), *report and recommendation adopted*, No. 1:18CV201, 2019 WL 718542 (S.D. Ohio Feb. 20, 2019)).

Plaintiff filed his application after May 23, 2017, so it is governed by the relatively new regulations describing how evidence is categorized, considered, and articulated when an RFC is assessed. *See* 20 C.F.R. §§ 404.1513(a), 404.1520c, 416.913(a), 416.920c (2017). Taken together, the regulations describe five different categories of evidence: (1) objective medical evidence, (2) medical opinions, (3) other medical evidence, (4) evidence from nonmedical sources, and (5) prior administrative medical findings.[1]  20 C.F.R. §§ 404.1513(a)(1)–(5); 416.913(a)(1)–(5).

Regarding two of these categories (medical opinions and prior administrative findings), an ALJ is not required to "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s) including those from [Plaintiff's] medical sources." 20 C.F.R. §§ 404.1520c(a); 416.920c(a).  Instead, an ALJ must use the following factors when considering medical opinions or administrative findings: (1) "[s]upportability"; (2) "[c]onsistency"; (3) "[r]elationship with [Plaintiff]"; (4) "[s]pecialization"; and (5) other factors, such as "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the SSA's] disability programs policies and evidentiary requirements." §§ 404.1520c(c)(1)–(5); 416.920c(c)(1)–(5).

---

[1] The regulations define prior administrative findings:

> A prior administrative finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record . . .

§§ 404.1513(a)(2), (5); 416.913(a)(2), (5).

Supportability and consistency are the most important of the five factors, and the ALJ must explain how they were considered. §§ 404.1520c(b)(2); 416.920c(b)(2). When evaluating supportability, the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support the medical opinion, the more persuasive the ALJ should find the medical opinion. §§ 404.1520c(c)(1); 416.920c(c)(1). When evaluating consistency, the more consistent a medical opinion is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the ALJ should find the medical opinion. §§ 404.1520c(c)(2); 416.920c(c)(2). An ALJ may discuss how he or she evaluated the other factors but is generally not required to do so. §§ 404.1520c(b)(2); 416.920c(b)(2).

## B.    Evaluation of Dr. Babson

Dr. Babson, a mental health provider, opined on how Plaintiff's mental state would impact his ability to work after she reviewed his medical records and conducted a clinical interview with Plaintiff. (Tr. 1155–62). She found that Plaintiff was moderately limited in daily living, social functioning, adaptation, and concentration, persistence, and pace. (Tr. 1160–61). She then concluded: Plaintiff's depressed mood would have a detrimental effect on the morale of a workplace; his irritability could lead to interpersonal conflict with others in the workplace, which would reduce his productivity; his difficulty staying focused would lead to reduced productivity; his difficulty with recalling information would result in his inability to complete workplace tasks; his difficulty comprehending information would prevent him from learning new tasks or roles; his social avoidance and withdrawal would likely cause interaction and attendance issues; and his feelings of hopelessness would result in low motivation to perform work tasks and a difficulty completing tasks. (Tr. 1161–62).

The ALJ found Dr. Babson's opinion only "mildly persuasive":

In January 2020, Lisabeth Babson, Ph.D., provided a psychological evaluation of [Plaintiff]. Dr. Babson opined that [Plaintiff] experienced moderate limitations in memory, adaptation, concentration, and social functioning due to his mental impairments that would reduce "his own productivity and possibly impact the functioning and morale of others" (Ex. 16F/10-17). I find this opinion only mildly persuasive in that although "paragraph B" limitations are supported by the evidence, the opinion is otherwise inconsistent with the medical evidence and the record as a whole, including [Plaintiff]'s history of treatment and medications, the mental status examination findings, and [Plaintiff]'s reported activities of daily living. Moderate limitations are supported by the evidence, but Dr. Babson's narrative was more aligned with findings of marked or extreme limitations, which are inconsistent with mild to moderate mental status examination findings in treatment settings (Ex. 19F/8, 22, 136).

(Tr. 25–26).

### 1. *Supportability*

Plaintiff contends the ALJ improperly considered supportability.  (Doc. 8 at 12).  He says: "The ALJ [did] not review the assertions Dr. Babson made in support of her own opinions."  (*Id.*). The Undersigned agrees.

Supportability is "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation . . . ."  Revisions to Rules Regarding Medical Evidence, 82 Fed. Reg. 5844, 5853.  An ALJ must explain how supportability was considered.   20 C.F.R. § 404.1520c(b)(2).   Here, the ALJ omitted any discussion of supportability.  While the ALJ mentions "support," he does not discuss or cite any of the evidence Dr. Babson relies upon in support of her opinion.  This is especially concerning because Dr. Babson's opinion is based upon what appears to be a thorough clinical interview with Plaintiff. (Tr. 1155–61).  In addition to reviewing Plaintiff's medical history (Tr. 1155–58) and conducting a mental status examination (Tr. 1159–60), Dr. Babson evaluated his functioning in activities of daily living, social functioning, persistence, concentration, and pace, and adaptation to stress/work stability with a paragraph explaining her reasoning (Tr. 1160–61).  Based upon these sources, she

concluded her opinion with an analysis on how Plaintiff's mental limitations would negatively impact his ability to work. (Tr. 1161–62).

Fundamentally, the ALJ seems to have conflated consistency with supportability. The sentence in which he discusses support, he states that: "Moderate limitations are supported by the evidence, but Dr. Babson's narrative was more aligned with findings of marked or extreme limitations, which are inconsistent with mild to moderate mental status examination findings in treatment settings (Ex. 19F/8, 22, 136)." (Tr. 25–26). Here, he is discounting Dr. Babson's opinion by comparing it to the record as a whole. He even cites records outside of Dr. Babson's treatment history or opinion. (*Id.* (citing Tr. 1617, 1631, 1745)). This is a consistency analysis, not a supportability explanation.

The Commissioner makes the same mistake, saying "the ALJ noted earlier in his decision that the treatment record revealed Plaintiff generally did not have issues with memory or cognition, and he could focus in a clinical setting." (Doc. 10 at 6 (citing Tr. 172, 374, 391–97, 1080–86, 188–95, 1106–07, 1111, 1605, 1617, 1631, 1745, 1785–86)). Again, this argument confuses the factors of supportability and consistency. An argument that Dr. Babson's opinion is incompatible with the record as a whole goes to consistency, not supportability. *Compare* 20 C.F.R. § 404.1520c(c)(1) *with* § 404.1520c(c)(2). The Commissioner also argues that "the ALJ cited to records from Dr. Babson showing that he considered supportability." (Doc. 10 at 6). The Commissioner fails to explain how the ALJ's citation of Dr. Babson's treatment notes elsewhere undercuts the supportability of her opinion. The Undersigned, upon review of the earlier mentions of Dr. Babson's opinion, finds that the ALJ did not provide further insight into his supportability determination. (*See* Tr. 17–18, 22).

All told, the Undersigned is unable to discern how the ALJ considered supportability in his evaluation of Dr. Babson's opinion. While the ALJ may ultimately find Dr. Babson's opinion unsupported, he must explain his reasoning. 20 C.F.R. § 404.1520c(b)(2). An explicit discussion allows Plaintiff to understand how the ALJ reached his ultimate decision. *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011). Because the ALJ did not address supportability, his analysis is insufficient; remand is recommended.

### 2. *Consistency*

Plaintiff also challenges the ALJ's evaluation of consistency. (Doc. 8 at 13). Essentially, Plaintiff argues the ALJ should have considered other evidence Plaintiff says is consistent with Dr. Babson's opinion. (*Id.*). The Undersigned concludes that the ALJ's consistency evaluation is satisfactory.

Consistency is the "extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules Regarding Medical Evidence, 82 Fed. Reg. 5844, 5853. When evaluating consistency, the Undersigned looks to the ALJ's immediate discussion regarding Dr. Babson's opinion, and also to his discussion of the record elsewhere in the opinion. This is because the ALJ's opinion ought to be read as a whole. *See Hill v. Comm'r of Soc. Sec.*, 560 F. App'x 547, 551 (6th Cir. 2014) (noting that the ALJ's entire decision must be considered); *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) (affirming ALJ evaluation of opinion where "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records" undercutting the opinion); *Carpenter v. Comm'r of Soc. Sec.*, No. 2:18-CV-1250, 2019 WL 3315155, at *10 (S.D. Ohio July 24, 2019), *report and recommendation adopted*, No. 2:18-CV-1250, 2019 WL 3753823 (S.D. Ohio Aug. 8, 2019) (considering the ALJ's discussion of Plaintiff's depressive disorder at step two when determining if the RFC is supported).

Here, the ALJ concluded that Dr. Babson's opinion that Plaintiff is moderately limited in the paragraph B criteria is consistent with the evidence. But he determined that the remainder of her opinion is overly restrictive and thus inconsistent with the record as a whole. (Tr. 25–26 (citing Tr. 1617, 1631, 1745)).

To bolster this determination, the ALJ cited to treatment records from one of Plaintiff's recurring mental health practitioners that indicated Plaintiff experienced only mild to moderate limitations. (Tr. 26 (citing Tr. 1617, 1631, 1745)). Elsewhere in the opinion, the ALJ noted that Plaintiff experienced depression, anxiety, anhedonia, poor self-esteem, decreased confidence, social isolation, somewhat impaired concentration, insomnia, anger, and irritability. (Tr. 21 (citing Tr. 1088–95, 391–397), Tr. 22 (citing Tr. 526–27, 1080–87, 398–522, 1163–1328, 1351–65, 1610–1757), Tr. 23 (citing Tr.1782–88, 1329–50, 1758–75)). But Plaintiff made some improvements with treatment, and he exhibited alertness, normal mood, cooperative and pleasant behavior, appropriate hygiene, intact thought process, normal speech, intact judgment and insight, and intact memory and cognition. (Tr. 21 (citing Tr. 1088–95, 391–397), Tr. 22 (citing Tr. 526–27, 1080–87, 398–522, 1163–1328, 1351–65, 1610–1757), Tr. 23 (citing Tr.1782–88, 1329–50, 1758–75)). In addition to medical records, the ALJ considered daily activities, including that Plaintiff cared for his plants, mowed the lawn, gardened, drove, prepared meals, cleaned the house, and participated in social activities like shopping, going to restaurants with his wife, and spending time with neighbors and family. (Tr. 17 (citing Tr. 195–203, 36–58), 18 (citing same), 23 (citing same)).

In sum, the ALJ considered Plaintiff's medical records and activities of daily living to conclude that Dr. Babson's opinion is somewhat inconsistent with the record as a whole. He expressly considered much of Plaintiff's mental health records but, importantly, the ALJ does not have to discuss every piece of evidence. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508

14

(6th Cir. 2006). Because the ALJ's discussion of consistency is clear and supported by the evidence, the ALJ properly considered consistency.

### C. Evaluation of Dr. Roach

Dr. Roach, a mental health provider, treated Plaintiff for several years. During that time, he completed multiple functional status evaluations. These evaluations ranked Plaintiff on a five-point scale in activities of daily living, social functioning, concentration, persistence, and pace, and adaptation. Dr. Roach opined that Plaintiff had moderate to marked limitations. (Tr. 1206, 1230, 1242, 1254, 1268, 1278, 1290, 1302, 1314, 1320, 1332).

The ALJ evaluated the opinions of Dr. Roach and Mr. Borchers together:

> Between January 2017 and December 2019, Ryan Borchers, M.Ed., L.P.C.C., and Lee Roach, Ph.D., provided functional status statements as to [Plaintiff] during therapeutic treatment sessions. Mr. Borchers and Dr. Roach noted at various times that [Plaintiff] experienced moderate to marked limitations in all "paragraph B" criteria. In an August 2017 statement, Mr. Borchers noted that [Plaintiff] has "progressed from moderate/marked impairments to moderate functional impairments" (see, e.g., Ex. 4F/3, 7, 13, 19, 117, 125). I find this opinion only mildly persuasive in that although "paragraph B" limitations are supported by the evidence, the opinion is otherwise inconsistent with the medical evidence and the record as a whole, including [Plaintiff]'s history of treatment and medications, the mental status examination findings, and [Plaintiff]'s reported activities of daily living. These functional status statements seem to be meant as "snapshots in time" of [Plaintiff]'s status at time of the appointments, rather than a global statement of [Plaintiff]'s workplace functioning and abilities.

(Tr. 26).

Plaintiff argues that the ALJ failed to evaluate Dr. Roach's opinions entirely, and thus "did not evaluate Dr. Roach's opinions for their supportability and consistency." (Doc. 8 at 18). Plaintiff further says that while the ALJ claims to have considered Dr. Roach's opinions, he "seemingly only evaluated one letter" provided by Mr. Borchers. (Doc. 8 at 18). The Undersigned disagrees with this characterization. The ALJ acknowledged the opinions of Dr. Roach and Mr. Borchers which assessed moderate to marked limitations. (Tr. 26). The ALJ appears to use the August 2017

statement as an example of the many opinions provided by both treating practitioners.  But the Undersigned concludes that the ALJ's supportability analysis is lacking, thus remand is recommended.

### 1.    *Supportability*

In evaluating Dr. Roach's opinions, the ALJ committed now familiar errors.  To the extent he mentions "support," he again appears to have conflated supportability and consistency.  So it is difficult for the Undersigned to evaluate how, or even if, he evaluated supportability.  (Tr. 26 ("[A]lthough 'paragraph B' limitations are supported by the evidence, the opinion is otherwise inconsistent with the medical evidence and the record as a whole, including [Plaintiff]'s history of treatment and medications, the mental status examination findings, and [Plaintiff]'s reported activities of daily living.")).  Further, even if the ALJ's use of the word "support" is intended to be a supportability analysis, he does not describe how the objective medical evidence or supporting explanations of Dr. Roach impacted the opinion's persuasiveness.  Thus, the analysis is lacking.

The ALJ went on to say that Dr. Roach's opinions "seem to be meant as 'snapshots in time' of [Plaintiff]'s status at time of the appointments, rather than a global statement of [Plaintiff]'s workplace functioning and abilities."  (Tr. 26).  While this snapshot-in-time evaluation may be a supportability analysis, it is not clear.  Regardless, that lone statement in this context is not enough. Rather than just providing one opinion, which could plausibly be found unsupported due to it being a snapshot in time, Dr. Roach provided multiple opinions from May 2017 (Tr. 1206) to January 2020 (Tr. 1332).  The ALJ failed to explain how these opinions in the aggregate are not supported. Or why, despite there being numerous opinions over time that are relatively consistent, he still finds them to be unsupported due to being "snapshots in time[.]"

The Commissioner's argument to the contrary is unconvincing. He does not explain how supportability was considered, rather simply recaps the ALJ's opinion. (Doc. 10 at 6–7). But what the ALJ did here was not enough.

### 2. Consistency

The ALJ properly evaluated consistency regarding Dr. Roach's opinions. The ALJ determined that Dr. Roach's opinion that Plaintiff was moderately or markedly impaired was only partially consistent with the record. He found that while some paragraph B limitations are consistent, Dr. Roach's limitations are too restrictive. The ALJ refers to his previous discussion of the record. (Tr. 26). As previously discussed, the ALJ noted that Plaintiff experienced depression, anxiety, anhedonia, poor self-esteem, decreased confidence, social isolation, somewhat impaired concentration, insomnia, anger, and irritability. (Tr. 21 (citing Tr. 1088–95, 391–97), Tr. 22 (citing Tr. 526–27, 1080–87, 398–522, 1163–1328, 1351–65, 1610–1757), Tr. 23 (citing Tr. 1782–88, 1329–50, 1758–75)). But Plaintiff made some improvements with treatment, and he exhibited alertness, normal mood, cooperative and pleasant behavior, appropriate hygiene, intact thought process, normal speech, intact judgment and insight, and intact memory and cognition. (Tr. 21 (citing Tr. 1088–95, 391–97), Tr. 22 (citing Tr. 526–27, 1080–87, 398–522, 1163–1328, 1351–65, 1610–1757), Tr. 23 (citing Tr. 1782–88, 1329–50, 1758–75)). In addition to medical records, the ALJ considered daily activities, including that Plaintiff cared for his plants, mowed the lawn, gardened, drove, prepared meals, cleaned the house, and participated in social activities like shopping, going to restaurants with his wife, and spending time with neighbors and family (Tr. 17 (citing Tr. 195–203, 36–58), 18 (citing same), 23 (citing same)). So, as before, the ALJ's discussion of consistency is sufficient.

### D. Evaluation of Dr. Mathias

17

Dr. Mathias, a chiropractic physician, provided an opinion regarding limitations due to

Plaintiff's shoulder:

> [Plaintiff's] current impairments would prohibit him from reaching above shoulder
> height in a repetitive fashion. Lifting greater than 10lbs to or above shoulder level
> would likely aggravate the shoulder and is not advised. [Plaintiff] would likely need
> a day or two off during the week and work limited hours during the week. Should
> the shoulder flare up, which tends to happen with more activity [Plaintiff] would
> need time to recuperate. This would likely be the case 1-2 time per week."

(Tr. 1790).

The ALJ evaluated Dr. Mathias's opinion:

> In August 2020, Bo Mathias, M.D., provided a functional capacity statement of
> [Plaintiff]. Dr. Mathias opined that [Plaintiff]'s "current impairments would prohibit
> him from reaching above shoulder height in a repetitive fashion [and] lifting greater
> than ten pounds … is not advised. [Plaintiff] would likely need a day or two off
> during the week and work limited hours during the week" (Ex. 21F). I find this
> opinion largely unpersuasive in that although reaching and lifting limitations are
> supported by the evidence, the opinion is otherwise consistent [sic] with the medical
> evidence and the record as a whole, including [Plaintiff]'s history of treatment and
> medications, the objective medical studies, the clinical examination findings, and
> [Plaintiff]'s reported activities of daily living. Findings of this extent of limitations
> are unsupported by mild to moderate clinical examination findings and evidence of
> overall improvements in [Plaintiff]'s functioning.

(Tr. 26–27).

### 1. *Supportability*

Again, Plaintiff contends the ALJ improperly considered supportability. (Doc. 8 at 15).

And again, the Undersigned agrees.

The ALJ committed now well understood errors. First, the ALJ says "Findings of this extent

of limitations are unsupported by mild to moderate clinical examination findings and evidence of

overall improvements in [Plaintiff]'s functioning." (Tr. 27). It is not clear whether the "clinical

examination findings" the ALJ references are those of Dr. Mathias or are a reference to the record

more generally. Adding to the confusion, the ALJ cited no records to clarify his analysis. Further,

the ALJ again seems to conflate supportability and consistency. (*See* Tr. 27 ("I find this opinion

largely unpersuasive in that although reaching and lifting limitations are supported by the evidence, the opinion is otherwise consistent [sic] with the medical evidence and the record as a whole, including [Plaintiff]'s history of treatment and medications, the objective medical studies, the clinical examination findings, and [Plaintiff]'s reported activities of daily living.")). Without additional explanation, the Undersigned cannot determine if the ALJ is discussing supportability, the extent to which Dr. Mathias's opinion is supported by the relevant objective medical evidence and his supporting explanations.

Looking elsewhere in the opinion adds no more clarity. The ALJ discussed Advantage Health and Rehabilitation Centers records which contain Dr. Mathias's treatment records. (Tr. 21– 22). In this discussion, the ALJ noted that Plaintiff continually reported pain and decreased function in his left upper extremity, left shoulder deficits, reduced strength and range of motion, stiffness, and tenderness; and he needed further rehabilitation. (*Id.*). But the ALJ also considered that treatment, including injections and rehabilitative exercises, appeared to be somewhat helpful, and there were overall improvements noted in strength and movement. (*Id.*). Dr. Mathias's opinion, noting limitations and the need for rest, is not obviously unsupported by these records. It is not the role of the Court to piece together the ALJ's logic. The role of the ALJ is to explain how supportability was considered. Here, that analysis is lacking.

And the Commissioner's argument to the contrary is unconvincing. He does no more than reiterate the ALJ's opinion rather than providing additional insight into whether supportability was considered. (Doc. 10 at 7).

> 2. *Consistency*

Again, Plaintiff challenges the consistency evaluation. (Doc. 8 at 15–16). The ALJ determined that this opinion was "largely unpersuasive" because the restrictive opinion is inconsistent with mild to moderate clinical examination findings and overall improvements in

functioning. (Tr. 27). The ALJ evaluated Plaintiff's shoulder limitations throughout the opinion. He noted Plaintiff's shoulder pain, weakness, stiffness, decreased functioning and strength, pain with range of motion, and his injury and subsequent repair surgery. (Tr. 20 (citing Tr. 310–20, 1604–09, 347–49, 352–56, 1131–33, 357, 365–67, 372–90), Tr. 21 (citing Tr. 603–848, 1369–1472, 1539–44, 1129, 563–97, 849–1011, 1473–1539, 1580–1603, 1139–44), Tr. 22 (citing Tr. 1063–79, 1012–60, 1123–25)). But the ALJ also cited records that showed Plaintiff's pain and weakness improved with physical therapy, injections were helpful, had no tenderness or swelling, had intact strength and a normal range of motion at times. (Tr. 20 (citing Tr. 310–20, 1604–09, 347–49, 352– 56, 1131–33, 357, 365–67, 372–90), Tr. 21 (citing Tr. 603–848, 1369–1472, 1539–44, 1129, 563– 97, 849–1011, 1473–1539, 1580–1603, 1139–44), Tr. 22 (citing Tr. 1063–79, 1012–60, 1123–25)). When viewed as a whole, the ALJ's consistency determination is supported by the evidence and enabled review. Thus, his consistency analysis is adequate.

*****

At base, the Undersigned must ask: Is the ALJ's decision supported by substantial evidence and was it made pursuant to the regulations? *See Cole*, 661 F.3d at 940. Here, the answer is no. The ALJ repeatedly failed to evaluate supportability properly. That is, he did not explain how the objective medical evidence or supporting explanations for the medical opinions were considered. While the ALJ may ultimately reach the same conclusion regarding persuasiveness of the opinions—and more broadly the RFC—he must evaluate supportability for each medical opinion. This allows Plaintiff, and the reviewing Court, to understand the ALJ's rationale for his persuasiveness determinations.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner's non-disability finding and **REMAND** this case to the Commissioner and

20

Administrative Law Judge under Sentence Four of § 405(g).

## V.     PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).


IT IS SO ORDERED.


Date:   September 13, 2022                          /s/ Kimberly A. Jolson
                                                   KIMBERLY A. JOLSON
                                                   UNITED STATES MAGISTRATE JUDGE